**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **RUBEN D. REYES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 15 CV 10134** |
| | ) | |
| **v.** | ) | **Magistrate Judge Cole** |
| | ) | |
| **CAROLYN W. COLVIN, Commissioner** | ) | |
| **of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

The plaintiff, Ruben D. Reyes, seeks review of the final decision of the Commissioner of the Social Security Administration denying his application for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. § 423(d)(2). Mr. Reyes asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision in his motion for summary judgment.

**Introduction**

**I.
Procedural History**

Mr. Reyes applied for Disability Insurance Benefits on April 9, 2013, alleging that he had been disabled since March 22, 2013, when he was shot in the right shoulder by an unknown shooter (R. 55-56). His claim was denied initially and on reconsideration (R. 55, 63). Mr. Reyes filed a written request for a hearing on February 3, 2014 (R. 86).

An ALJ convened a hearing on June 27, 2014, at which Mr. Reyes waived his right to representation by counsel (R. 39, 41-42). After some brief questioning, the ALJ continued the

hearing to request further medical records. (R. 52-53). At the second hearing on April 7, 2015, Mr. Reyes appeared and testified and was represented by counsel (R. 1090). Dr. Ashok G. Jilhewar, MD, testified as the medical expert, Dr. Allen Heinemann, PhD, testified as the psychological expert, and Lee O. Knutson testified as the Vocational Expert ("VE") (R. 1092).

On July 15, 2015, the ALJ found that Mr. Reyes was not disabled and denied his application for Disability Insurance Benefits because, although Mr. Reyes could no longer perform his past medium work, he could still perform a limited range of light work (R. 9-38). The ALJ's decision became the Commissioner's final decision on September 4, 2015, when the Appeals Council denied Mr. Reyes' request for review (R. 1-6). See 20 C.F.R. §§ 404.955. Mr. Reyes appealed the decision to the United States District Court for the Northern District of Illinois under 42 U.S.C. § 405(g), claiming that the ALJ improperly evaluated his credibility and rejected the opinions of his treating and examining doctors.

## II.
## The Record Evidence

### A.
### Vocational Evidence

Mr. Reyes was born on June 6, 1975, making him 37 years old when he filed his application (R. 30). He has at least a high school equivalent education and can communicate in English (R. 30). According to his Work History Report, Mr. Reyes was a tow truck driver for Shell Gas Station from July 2002 to May 2003 (R. 169). He was then a self-employed mechanic from 2006 to 2007 (R. 169). Finally, he was an intern at Lygase from July 2009 to December 2012 (R. 169). As a tow truck driver, Mr. Reyes noted that he had to lift and carry wheel-lift equipment, ranging from about twenty to twenty-five pounds (R. 170). As a mechanic he replaced car parts, lifting anywhere from twenty to fifty pounds (R. 171). Finally, as an intern for

Lygase he lifted and set-up equipment, lifting less than ten pounds frequently and fifty pounds occasionally (R. 172).

## B.
## Medical Evidence

The record is 1157 pages long and in no particular order. It is not organized chronologically, and multiple pages of the record are duplicated throughout.

## 1.
## Physical Impairments

On March 22, 2013, Mr. Reyes was shot in his dominant, right shoulder while riding in the backseat of a car (R. 275). As a result of the accident, Mr. Reyes claims to suffer from both physical and mental impairments. Following the accident, the fire department took Mr. Reyes to the emergency department at Advocate Lutheran General Hospital (R. 261). He was seen immediately upon arrival (R. 261, 263, 264). He complained of right shoulder pain (R. 264). The radiology was unremarkable except for the bullet, and all of his vitals were stable (R. 266, 264). The doctor also found marijuana in his system (R. 296). He was discharged the same day, with no follow-up instructions (R. 238).

On April 9, 2013, Mr. Reyes returned to Advocate Lutheran General Hospital, complaining of pain in his right shoulder due to a fall (R. 236). Mr. Reyes' grip strength was normal, and he had normal strength and range of motion in his right wrist and hand, normal range of motion in his right elbow with pain radiating to his right upper arm and shoulder, and minimal range of motion in his right shoulder due to pain (R. 237). Mr. Reyes cried from pain during this exam (R. 237). The ultimate diagnosis was contusion of the upper extremity (R. 237).

On June 24, 2013, the Bureau of Disability Determination Services arranged a Consultative Examination for Mr. Reyes with Dr. Roopa Karri (R. 326). Dr. Karri spent forty-

two minutes with Mr. Reyes, reviewing his records and information (R. 325). Dr. Karri found that his grip strength was 3/5 in both hands, and that he had moderate difficulty squeezing the blood pressure pump with his right hand (R. 327). His strength was 4/5 in his right upper limb (R. 327). However, he could button, zip, tie shoelaces, make fists, and oppose fingers (R. 327). During this examination, he could walk fifty feet without support (R. 327). Dr. Karri reported no signs of depression, agitation, irritability, or anxiety (R. 327).

On September 16, 2013, Mr. Reyes returned to Advocate Lutheran General Hospital, complaining of hand pain and numbness (R. 377). At this time, doctors attempted to remove the bullet from Mr. Reyes' shoulder but were unsuccessful because the bullet was located so close to nerve cells that a neurosurgeon would have to remove it (R. 327).

Mr. Reyes began seeing Dr. Patel, his primary care doctor, on November 14, 2013 (R. 394). At this time, Dr. Patel diagnosed Mr. Reyes with anxiety and shoulder pain (R. 405). Mr. Reyes continued to see Dr. Patel from November 2013 through May 2015 and repeatedly complained of pain to his right shoulder (R. 404, 414-415, 422, 429, 434, 446, 951, 957, 962, 970, 973). On the whole, Mr. Reyes saw Dr. Patel monthly for two years (R. 848).

On March 27, 2015, after two years of treating Mr. Reyes on a monthly basis, Dr. Patel completed a Physical Medical Source Statement (R. 848). He diagnosed Mr. Reyes with anxiety and chronic pain, noting that his symptoms were anxiety, insomnia, and chronic, severe right shoulder pain (R. 848). Dr. Patel opined that his physical conditions were affected by his depression and anxiety (R. 849). He concluded that in an eight-hour workday Mr. Reyes could stand and walk for less than two hours, sit for about two hours, and never lift or carry anything ten pounds or heavier (R. 850). He could only sit or stand for an hour at a time before changing positions. (R. 850). He could only rarely bend, crouch, squat, and climb ladders and could

occasionally twist and climb stairs (R. 850). He had "significant limitations" in reaching, handling, and fingering (R. 850). He could use his right hand 10% of the workday, his right fingers 40% of the workday, and he could reach in front of his body 10% of the day (R. 850). He was unable reach overhead with his right arm (R. 850). Dr. Patel also estimated that Mr. Reyes would likely be "off task" 10% of the day, and that he was only capable of "low stress" work, likely missing approximately one day per month (R. 851). Dr. Patel noted that Mr. Reyes' right shoulder tests were normal (R. 851).

On November 26, 2013, Mr. Reyes visited neurosurgeon, Dr. Shaun O'Leary, for a treatment consultation (R. 510). Dr. O'Leary reported that Mr. Reyes had some mild weakness and pain in his right arm (R. 511). Dr. O'Leary found that Mr. Reyes could move all of his extremities with 5/5 strength except the right upper extremity which was limited by pain and only had 4+/5 strength (R. 512). Dr. O'Leary suggested the possibility that Mr. Reyes suffered from Complex Regional Pain Syndrome (CRPS), which could require a spinal cord stimulator to treat the pain (R. 512). Dr. O'Leary also discussed the possibility of another surgery to remove the bullet from Mr. Reyes' shoulder, warning him that the pain might continue after the surgery (R. 512). In the pre-operative report Dr. Seitz, a plastic surgeon who assisted Dr. O'Leary with the surgery, admitted that removing the bullet could worsen Mr. Reyes' pain (R. 555).

On May 29, 2014, Dr. Seitz and Dr. O'Leary removed the bullet (R. 555, 559). After the surgery, Mr. Reyes continued to complain to Dr. Patel of shoulder pain (R. 404, 414-15, 422, 429, 434, 446, 951, 957, 962, 970, 973).

On September 30, 2014, Mr. Reyes attended a physical therapy evaluation at Presence Holy Family (R. 1023). He appeared to have decreased shoulder range of motion, decreased strength, and pain in his right shoulder (R. 1025). Mr. Reyes was supposed to begin physical

therapy multiple times per week, but there is no record of additional physical therapy sessions (R. 1028-29).

Mr. Reyes met with an orthopedic surgeon, Dr. Nicholas Frisch, on February 16, 2015, complaining of constant, significant pain radiating from his shoulder to his elbow (R. 852, 854). He also reported tingling in his right shoulder area (R. 854). At this time both the X-Rays and the range of motion tests were mostly normal (R. 854). Dr. Frisch speculated that much of Mr. Reyes' pain could have come from trauma to his trapezius muscle during his first unsuccessful surgery (R. 855). He also stated that he was "not extremely optimistic" that further surgical intervention would significantly improve Mr. Reyes' symptoms (R. 855).

## 2.
## Mental Impairments

On October 22, 2013, Mr. Reyes returned to the emergency department of Advocate Lutheran General Hospital, complaining of depression and suicidal thoughts (R. 626). He was diagnosed with anxiety and chronic shoulder pain (R. 626). During his psychological assessment conducted on October 23, 2013, Mr. Reyes' heart was pounding heart, and he experienced chest tightness, and suffered from the feeling of impending doom (R. 837). The report also stated that he was hyper-vigilant and hesitant to go to sleep at night (R. 837). He reported that he slept poorly and frequently woke up during the night due to nightmares about the shooting (R. 837). He was also noted to have exaggerated startle response (R. 837). He was diagnosed with generalized anxiety disorder and post-traumatic stress disorder (PTSD) (R. 646).

On October 23, 2013, Mr. Reyes requested referrals for outpatient therapists because he had just recently applied for CountyCare Insurance (R. 645). He was directed to ask Advocate Lutheran General Hospital for a referral (R. 645).

On November 27, 2013, the Social Security Administration arranged for Mr. Reyes to have a psychological consultative examination with Dr. Norton B. Knopf (R. 384). Mr. Knopf spent a total of 1.5 hours with Mr. Reyes before writing his report (R. 384). During their time together, Mr. Reyes complained of major anxiety and the existence of panic attacks (R. 385). He did not cook or do chores and required help from his family to conduct activities of daily living (R. 387). He also reported experiencing trouble sleeping, seeing dark shadows, and hearing sharp noises like gunshots (R. 386-87). Finally, Mr. Reyes explained that he was trying to see a psychiatrist but kept getting denied for insurance reasons (R. 387).

Dr. Knopf observed overt signs of distress during the interview, including tearfulness as Mr. Reyes described his lack of returned calls from hospitals due to his medical insurance situation (R. 385). He said that Mr. Reyes seemed scared and nervous, and reported daily bouts of anxiety, although he did not exhibit any signs of anxiety during the interview itself (R. 385-86). Dr. Knopf noted that there were indications of the presence of delusions, and Mr. Reyes admitted to having compulsions and obsessive thoughts (R. 386). Dr. Knopf concluded that Mr. Reyes was reliable during the interview and seemed trustworthy (R. 388). Dr. Knopf's diagnostic impressions were that Mr. Reyes suffered from generalized anxiety disorder, major depressive disorder, PTSD, and moderate cannabis use disorder (R. 389).

From February 25, 2015 to March 31, 2015, Mr. Reyes had weekly psychological assessments with Alyssa Naimon, a clinical intern at Presence St. Mary's (R. 859). She observed that he had a depressed mood, flat affect, and hypomanic speech (R. 865). He reported frequent thoughts of suicide, lack of friends, difficulty leaving the house, difficulty falling asleep, observance of shadows resembling the reaper, the frequent occurrence of angry outbursts at family members, and hearing gunshots and occasional screams (R. 865-68). He told her that he

could barely remember what life was like before he was shot (R. 868). Mr. Reyes reported feeling a lot of anxiety when he went to the emergency room in October 2013 because the waiting area was crowded with what he believed to be potentially dangerous people (R. 866). During a few of his visits Mr. Reyes reported that he was too scared to attend a wedding or take his son to the toy store for his birthday (R. 928, 1039).

On April 28, 2015, Dr. Ahmadi, a psychiatrist at Presence St. Mary's hospital, completed a Mental Medical Source Statement for Mr. Reyes (R. 1040). He diagnosed Mr. Reyes with PTSD, bipolar disorder, and related disorder due to a medical condition (R. 1040). He reported findings of motor agitation with sad/irritable mood, constricted affect with increased intensity, slow speech, hopelessness, helplessness, anhedonia, circumstantial thought process, and a cognitive deficit on attention (R. 1040). He concluded that Mr. Reyes was not mentally fit to work, but that he had a high chance of recovery and reduced symptoms with intense psychotherapy and medical management (R. 1040). He reported that Mr. Reyes had no ability to carry out short and simple instructions, maintain attention for two-hour segments, maintain regular attendance and be punctual, complete a normal workday or workweek without interruptions from psychologically based symptoms, get along with co-workers without distracting them, respond appropriately to changes in a routine work setting, or deal with normal work stress (R. 1042). He expected that Mr. Reyes would be absent from work more than four days per month (R. 1044).

### C.
### The Administrative Hearing Testimony

### 1.
### Mr. Reyes' Testimony

On April 7, 2015, Mr. Reyes had his second hearing with the ALJ (R. 1090). Mr. Reyes testified that he was living with his mother and his grandmother in his grandmother's home[1] (R. 1119). Mr. Reyes complained of both physical and mental impairments (R. 1096-128). He reported that he had been in constant pain and had problems with his arm even when he was sitting down, requiring him to sit a certain way to avoid pain (R. 1108, 1127). He was able to write for awhile, but then his arm would begin to hurt (R. 1108). He was able to dress, feed, and bathe himself, but he was still unable to assist his grandmother with household chores like cooking, cleaning, and laundry[2] (R. 1119). Picking up dishes and scrubbing pots, he reported, hurt his shoulder (R. 1122). Before his mother arrived to help his grandmother, he testified that he mostly only made sure that his grandmother took her medicine and looked after her (R. 1119).

---

[1]     At his first hearing on June 27, 2014, Mr. Reyes' testimony was similar to the testimony that he gave during his second hearing. One thing to note, however, is that during the first hearing Mr. Reyes testified that he tried calling many of the mental health doctors referred to him by Dr. Patel, but he could not find one with any openings until September (R. 48). Further, many of the doctors were located ten to twenty miles away (R. 48-49).

[2]   In the Activities of Daily Living Report, dated May 11, 2013, Mr. Reyes reported that his mother, grandmother, and sometimes his brother helped him cook and bathe (R. 173). He also wrote that he was unable to do any household chores because he could not use his right arm to pick anything up (R. 176-77). Similarly, on the Appeals Disability Report, dated October 22, 2013, Mr. Reyes reported that after his first surgery he had more difficulty taking care of his daily needs like dressing and feeding himself (R. 186, 189). He needed assistance from family members to complete these tasks (R. 189). In the Function Report from November 4, 2014, Mr. Reyes again noted that he experienced pain when completing his normal daily activities (R. 192). He reported an inability to do household chores or leave the house for any reason other than medicine and doctors appointments (R. 194-95). He also reported experiencing pain when opening books, sorting or filing papers, dialing the phone, and using a pen or pencil (R. 200). He was unable to carry bags or take out the trash, and he required assistance when using kitchen utensils and opening jars (R. 200). In another disability appeals report submitted on February 4, 2014 Mr. Reyes reported that he required assistance from his grandmother to help him cook and cut up his food (R. 209).

On occasion he accompanied her to the grocery store, but when he did he frequently felt like he was having a panic attack (R. 1119).

To cope with the pain, Mr. Reyes went through roughly a bottle of Toradol every month and occasionally took hot baths (R. 1113, 1125). He sometimes received medications from his friends and Norco from his mother (R. 1114).

Regarding his mental health, Mr. Reyes reported feeling panicky and nervous at the hearing[3] (R. 1096). He testified that he had trouble sleeping as a result of seeing shadows and hearing noises (R. 1126). Similarly, anywhere from one to three times per month he reported having dreams that he was dead or wishing that he would have been killed[4] (R. 1126). Mr. Reyes also testified that he received threatening phone calls after his second surgery and was constantly afraid to leave the house[5] (R. 1099-100). At the time, the shooter was still unknown to Mr. Reyes, and for all that we know the shooter is still unknown (R. 1100-102). Mr. Reyes testified that he took Zoloft everyday as prescribed. He also admitted to using marijuana, stating that it helped him with his anxiety (R. 1125).

---

[3] A Social Security Administration employee completed a Disability Report for Mr. Reyes on April 9, 2013, noting that Mr. Reyes started to cry whenever he was asked about the shooting (R. 160).

[4] On the Activities of Daily Living Report from May 11, 2013, Mr. Reyes mentioned often having nightmares about someone trying to kill him (R. 173). In a function report completed on the same date, he reported being so afraid that he would be shot again that he mostly stayed inside his home (R. 177, 179).

[5] In the Function Report, completed on May 11, 2013, Mr. Reyes reported being so afraid that he would be shot again that he did not leave the house without the company of family members. (R. 177, 179). He reported only leaving the house for church and to see family, noting that he frequently looked around to ensure that no one was following him and jumped when he heard loud noises (R. 179-80). Again in the Function Report dated November 4, 2013, Mr. Reyes complained that his anxiety was so bad that he was unable to leave the house or have a social life, constantly fearing being shot again (R. 192). Finally, in the Disability Report submitted on February 4, 2014, Mr. Reyes reported frequent anxiety attacks and a fear of leaving the house (R. 208-09).

Regarding his insurance, Mr. Reyes testified that he had CountyCare insurance[6] (R. 1103). He had a difficult time finding a place to receive therapy as a result of his insurance (R. 1104). Many places simply denied his insurance, while others would only see the first ten people waiting in line in the morning (R. 1098). Frequently when he would go wait for these appointments he would have seizures and panic attacks in the waiting room as a result of being surrounded by strangers (R. 1098).

**2.**
**The Medical Expert's Testimony**

Medical expert, Dr. Allen Heinmann, testified regarding Mr. Reyes' mental health. After reviewing the medical records, he testified that Mr. Reyes exhibited signs of depression that were not diagnosed by a treating source (R. 1130). Dr. Heinmann classified both Mr. Reyes' activities of daily living and his social functioning as moderately limited (R. 1130). He also had mild limitations concentrating (R. 1131). Dr. Heinmann did not find evidence of deterioration or decompensation (R. 1131). He was optimistic that Mr. Reyes' symptoms would get better with treatment (R. 1131). He believed Mr. Reyes capable of doing simple, up to three-step tasks, if limited to infrequent and superficial contact with coworkers and the general public with no coordinated activities (R. 1131-32).

The second medical expert, Dr. Ashok Jilhewar, testified regarding Mr. Reyes' physical health (R. 1132). He found that Mr. Reyes had an impairment of gunshot injury resulting in chronic pain to the right shoulder area (R. 1136). Dr. Jilhewar testified that Mr. Reyes had a minimal weakness of 4+/5 in his right shoulder abduction but no other neurological abnormality (R. 1136). He found Mr. Reyes to be limited to light physical activity, meaning that he could lift ten pounds frequently, could reach overhead with his right, dominant arm frequently rather than

---

[6] Previously, in the April 9, 2013 Disability Report, Reyes stated that he would like to get medical help but that he did not have a medical card or any way to see a counselor (R. 160).

constantly, sit up to six hours in an eight-hour workday with normal breaks, walk or stand up to six hours with normal breaks, and unable to work on ladders, ropes or scaffolds (R. 1136). He noted that there were no impairments to the hips, pelvis, or sacroiliac joint noted in the medical records (R. 1138). Further, nothing indicated that there was anything wrong with Mr. Reyes' left arm, and his right shoulder tests looked normal (R. 1138-39). Dr. Jilhewar did not think that use of his hands or fingers should hurt his shoulder (R.1138-39).

Dr. Jilhewar testified that there were no clinical findings to support the possibility of CRPS (R. 1140-41). He admitted that pain is subjective but stated that if a patient complains of pain, he needs to show intensity of pain management (R. 1142).

### 3.
### The Vocational Expert's Testimony

The VE, Lee Knutson, testified that Mr. Reyes' past work experience as a tow truck driver, mechanic, and intern and Lygase, was all skilled, semiskilled, or physically demanding work (R. 1149). Consequently, Mr. Reyes could not perform his past work (R. 1149).

In response to the ALJ's first hypothetical, he testified that an individual 1) limited to light work, 2) able to lift 10 pounds frequently and 20 pounds occasionally using both arms, 3) able to sit, stand, and walk for six hours per day, 4) unable to handle unprotected heights, ladders, ropes or scaffolds, 5) able to occasionally reach overhead with his dominant extremity 6) able to complete simple, routine tasks, 7) unable to have contact with the general public, 8) able to work in proximity to coworkers but not in conjunction with them or on team tasks, 9) able to meet end of the day goals but unable to meet fast-paced or high production demands, would be incapable of returning to any of Mr. Reyes' past work because it was skilled, semiskilled, or too physically demanding (R. 1149). However, the VE testified that such a person could perform the duties of a housekeeping cleaner doing light and unskilled work (21,000 jobs

in Illinois and 550,000 jobs nationally), mailroom clerk performing light and unskilled work (2,600 jobs in Illinois and 50,000 jobs nationally), or a dishwasher performing only light and unskilled work (3,800 jobs in Illinois and 100,000 jobs nationally) (R. 1149-50).

In the second hypothetical, the ALJ limited the individual's dominant right hand to only occasional fingering and handling (R. 1150-51). The VE said that all of the previously listed jobs would be eliminated and the hypothetical individual could not perform any work (R. 1150-51)

Responding to the ALJ's third hypothetical, the VE testified that a person limited to sedentary work with no unprotected heights, occasional overhead reaching with the dominant right arm, simple routine tasks, no contact with the general public, no teamwork, unable to work at production pace and has frequent use of his hands would be precluded from all jobs because at the sedentary level employees are either working at production pace or interacting with people (R. 1154).

In response to the ALJ's final hypothetical, the VE testified that an employee who is off task twenty percent of the time would not be able to sustain full-time work (R. 1151).  Further, anyone who is off task fifteen percent or more of the time is likely to lose his job (R. 1152). During the probationary period of employment, it would be unlikely for an employee who missed two or more days a month regularly to keep his job (R. 1153).

### III.
### The ALJ's Decision

On July 15, 2015, the ALJ found that Mr. Reyes was not disabled and therefore did not qualify for Social Security Disability Insurance (R. 9-38). She believed that Mr. Reyes' allegations were "not credible," and reasoned that Mr. Reyes had the residual functional capacity (RFC) to perform light work, as detailed by the VE's testimony (R. 17).

First, the ALJ concluded that Mr. Reyes had not engaged in substantial gainful activity since April 9, 2013 (R. 14). Second, she found Mr. Reyes' severe impairments to be residuals of a gunshot wound with chronic right shoulder pain, major depressive disorder, and anxiety disorders, including PTSD (R. 14). The ALJ dismissed the possibility that Mr. Reyes was suffering from CRPS related to the gunshot wound because Dr. O'Leary did not make a definitive finding and no other doctor's findings corroborated the possible diagnosis (R. 14-15). She also dismissed the possibility that Mr. Reyes' marijuana use affected his RFC (R. 15).

Third, the ALJ concluded that Mr. Reyes did not have an impairment or combination of impairments equivalent in duration or severity to those listed in 20 CFR Part 404, Subpart P, Appendix 1 (R. 15). 20 CFR 416.920(d). She found that Mr. Reyes could perform fine and gross manipulative activities, highlighting his intact grip strength, ability to oppose his fingers, make a fist, button, zip, and write legibly (R. 16). She noted that this finding was consistent with Dr. Jilhewar's testimony, which she gave great weight (R. 16). She also concluded that the combined effects of Mr. Reyes' mental and physical impairments caused moderate limitations in activities of daily living, mild limitations in sustaining concentration, persistence, or pace, and no episodes of decompensation (R. 16). His mental impairments alone, she found, caused moderate limitations in maintaining social functioning (R. 16). According to the ALJ, Mr. Reyes failed to demonstrate an inability to function outside of his home, repeated episodes or decompensation, or the need to be in a highly structured environment or supportive living arrangement (R. 16).

Fourth, the ALJ concluded that Mr. Reyes had the RFC to perform a reduced range of light work (R. 17). She determined that he could lift or carry twenty pounds occasionally and ten pounds frequently using both arms, stand or sit six out of eight hours in workday, occasionally reach overhead with his right arm, perform simple, routine tasks, and meet end of the day goals

(R. 17). He could not work at unprotected heights, have frequent contact with the public, work on group project, or meet high production demands (R. 17).

In determining Mr. Reyes' RFC, the ALJ considered his symptoms and their severity using a two-step process (R. 17). First, she determined whether there was an underlying medically determinable impairment, and second whether that impairment could produce Mr. Reyes' pain or symptoms.

The ALJ began by summarizing Mr. Reyes' testimony about his physical pain: constant pain in his shoulder, arm, and back, inability to lift heavy items, inability to fully raise his arm, poor sleep, numbness and tingling in the arm, and exhaustion after writing for longer than fifteen minutes (R. 17-18). She listed his pain medications: Elavil (antidepressant and nerve pain medication), Tramadol (narcotic pain medication), Zostrix cream (topical cream to treat nerve pain), Norco (opioid pain medication), Motrin (anti-inflammatory), Norflex (muscle relaxant), Flexeril (muscle relaxant), and Gabapentin (nerve pain medication and anticonvulsant) (R. 18). She also summarized his testimony about his mental impairments: extreme anxiety, fear of leaving the home, panic attacks, constantly seeing shadows, hearing gunshot sounds, frequent suicidal ideations (R. 18).

After considering Mr. Reyes' testimony, she found that his medically determinable impairments could be reasonably expected to cause his symptoms; however, his testimony about the intensity, persistence, and effects of his symptoms was not credible and was inconsistent with the RFC assessment (R. 18).

The first factor she used to support her credibility finding was the medical evidence, which she claimed did not fully corroborate his allegations (R. 18). She discussed the medical records chronologically and in detail (R. 18-23).

The ALJ stated that she could not give much weight to Mr. Reyes' allegation that after he started taking the Zoloft he heard screaming and traumatic voices and saw shadows that resembled the reaper (R. 23). Because he never reported these symptoms to Dr. Patel, continued refilling the prescription for years, and was never observed responding to internal stimuli, she could not give his statements much weight (R. 23).

Next, the ALJ decided not give Dr. Ahmadi's medical source statement significant weight because it was only based on one visit in which Mr. Reyes complained of symptoms that had never been present in previous examinations, such as hallucinations and abnormal motor movements (R. 24). She also argued that Mr. Reyes did not pursue specialized behavior health care until almost two years after being shot (R. 25). She noted that he remained on the same dosage of Zoloft with no reports that the medication was ineffective (R. 25). She discounted his trip to the emergency department in October 2013 as being an exemplification of his symptoms because she said those symptoms were moderate at most, were resolved quickly, and possibly were a result of Mr. Reyes running out of his narcotic medication (R. 25). Instead, she gave greater weight to Dr. Heinemann's testimony that Mr. Reyes would likely get better with treatment and medical compliance (R. 25).

Regarding Mr. Reyes' physical impairments, the ALJ gave greater weight to Dr. Jilhewar's opinion because of his ability to review a more complete record (R. 26). Dr. Jilhewar testified that nothing in the medical record showed anything that would cause a reduction in Mr. Reyes' use of his right hand, noting he was able to button, zip, tie his shoelaces, make a fist, oppose his fingers, and complete handwritten forms as part of his application (R. 26). Dr. Jilhewar also opined that Mr. Reyes would likely have trouble lifting and carrying heavy weights (R. 25). Consequently, the ALJ concluded that Mr. Reyes should be limited to light work, where

using both hands he lifted up to twenty pounds occasionally and ten pounds frequently, sitting and standing/walking for up to six hours in an eight-hour day, unable to work at any unprotected heights, and reaching overhead only occasionally with his right arm She also concluded that he could sit and stand/walk up to six hours in an eight-hour day (R. 25-26).

The ALJ relied on Dr. Jilhewar's statement that Dr. Patel's assessment of Mr. Reyes was not supported by the medical record (R. 26). She specifically noted that Mr. Reyes sat for over an hour during his hearing, had a consistently normal gait, and suffered no impairments in his lower extremities (R. 26). Because his left arm was not impaired, he should be able to lift ten pounds with both arms (R. 26). Dr. Jilhewar also stated that Dr. Patel's restrictions on stooping, crouching, squatting and stair climbing were unsupported by the evidence (R. 26). Finally, the ALJ argued that Dr. Patel's statements were contradictory and inconsistent because he pointed out that the right shoulder tests were normal but also claimed that the right shoulder was impaired (R. 26).

Next, the ALJ summarized Dr. Heinemann's testimony concerning Mr. Reyes' mental health. Regarding Mr. Reyes' activities of daily living, the ALJ stated that Mr. Reyes attributed some of his claimed limitations to his chronic pain rather than solely depression or anxiety (R. 27). She also pointed out that Mr. Reyes did not display apathy in caring for himself or his surroundings, regularly attended appointments, and continued to take care of his son (R. 27). Mr. Reyes, she stated, was able to meet with doctors, maintain a close relationship with his family, and continue regular visitation with his child (R. 27). She reported that he was also cooperative and forthcoming during his hearing (R. 27).

The ALJ stated that Dr. Ahmadi did not have any objective test results to support his conclusions and had only met with Mr. Reyes once prior to drawing those conclusions (R. 24-

25). Further, Dr. O'Leary found no deficits of memory, attention, or concentration, and Mr. Reyes responded appropriately to her questions during the hearing (R. 28). Similarly, she refused to give weight to Dr. Patel's mental assessment of Mr. Reyes because she found it to be unsupported by medical records (R. 28).

She next responded to Mr. Reyes' claims of limited activities of daily living by arguing that they could not be verified with any degree of certainty, were contradicted by his previous written statements, and could be attributed to something else besides his mental and physical impairments (R. 29).

Regarding his physical impairments, the ALJ stated that his treatment was "limited and conservative" (R. 29). In support of this claim she pointed out that the record did not include recommended diagnostic testing (R. 29). As for Mr. Reyes' testimony regarding insurance difficulty, she stated that the emergency room was always an option (R. 29). Further, she noted there are other low cost community resources like low cost/no cost clinics and hospital charity programs (R. 28-29). Mr. Reyes never required crisis intervention, inpatient hospitalization, or significant changes in medication (R. 29). He continued to take Zoloft, despite the hallucinations which he attributed to taking the drug (R. 29). She stated that he never reported these side effects to Dr. Patel (R. 29).

Given these findings, the ALJ affirmed the VE's testimony that Mr. Reyes did not have the RFC to perform his past work experience because he was only capable of light work involving simple, routine tasks (R. 30). Following the VE's testimony, the ALJ determined that given Mr. Reyes' age, education, work experience, and RFC, he would be able to perform the requirements of occupations such as housekeeper/cleaner (550, 000 jobs nationally; 21,000 in

Illinois), mail room clerk (50,000 jobs nationally; 2,600 in Illinois), and dishwasher (100,000 light unskilled jobs nationally; 3,800 in Illinois) (R. 31).

Finally, having trusted the VE's testimony regarding all discrepancies between his testimony and the DOT, the ALJ ruled that Mr. Reyes was capable of successfully transitioning to other work that exists in significant numbers nationally (R. 31). A finding of "not disabled" was appropriate (R. 31).

## IV.
### Discussion

### A.
### The Standard of Review

The court must affirm the ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g); *Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002). Substantial evidence refers to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Curvin v. Colvin*, 778 F.3d 645, 648 (7th Cir. 2015) (quoting *McKinzey v. Astrue,* 641 F.3d 884, 889 (7th Cir. 2011)). The standard of review is deferential, and the court may not reconsider facts and evidence. *Connour v. Barnhart*, 42 Fed. App'x 823, 827 (7th Cir. 2002); *Clifford v. Apfel,* 227 F.3d 863, 869 (7th Cir. 2000). The ALJ must "minimally articulate" the reasons for her ultimate conclusion by building an "accurate and logical bridge" from the evidence to the conclusion. *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001); *Clifford*, 227 F.3d at 872. If the ALJ's decision "lacks evidentially support" or is so poorly articulated as to prevent meaningful review, the case must be remanded. *Steele v. Barnhard*, 290 F.3d 936, 940 (7th Cir. 2002).

**B.**
**The Five-Step Sequential Analysis**

Disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled. 20 C.F.R. § 416.920(a)(4). If at any step the claimant is found to not be disabled, the claim does not need to be reviewed any further. *Id.*

1) Is the plaintiff engaged in substantial gainful employment? 20 C.F.R. § 416.920(a)(4)(i). If yes, the claimant is not disabled. If no, the judge continues to the next step. 20 C.F.R. § 416.920(b).

2) Does the plaintiff have a severe medically determinable impairment or combination of impairments? 20 C.F.R. § 416.920(a)(4)(ii) If no, the claimant is not disabled. If yes, the judge continues to the next step. 20 C.F.R. § 416.920(c).

3) Does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations? 20 C.F.R. § 416.920(a)(4)(iii). If yes, the claimant is disabled. If not, the judge continues to the next step. 20 C.F.R. § 416.920(d).

4) Does the claimant have the RFC to perform his past relevant work? 20 C.F.R. § 416.920(a)(4)(iv). If yes, the claimant is not disabled, and if no, the judge continues to the final step. 20 C.F.R. § 416.920(f)-(h).

5) Given the claimant's RFC, can he do any other work in the national economy? 20 C.F.R. § 416.920(a)(4)(v). If yes, the claimant is not disabled, and if no, the claimant is disabled. *Id.* In order to show that an individual is not disabled at this step, the ALJ has the burden

to prove that the work that the claimant can perform, taking into account his RFC, exists in significant numbers in the national economy. 20 C.F.R. § 416.920(g)-(h).

## C.
### Analysis

Mr. Reyes makes two main arguments for reversal. First, he argues that the ALJ improperly weighed the medical opinions, rejecting the opinions of his treating and examining doctors. Second, he claims that the ALJ improperly evaluated his credibility[7]. The two claims are interrelated. The thesis of the ALJ's argument about the weight of medical opinions is that the treating physician, Dr. Patel, based his opinion on Mr. Reyes' complaints, which the ALJ felt were not credible. Thus, the ALJ's credibility determination is central to his decision, as it often is in these cases.

### 1.
### The Credibility of Mr. Reyes

Mr. Reyes' main and most important criticism of the ALJ's decision is that the ALJ incorrectly determined that he lacked credibility, without substantial evidence to support that determination. The ALJ found that Mr. Reyes lacked credibility for three reasons: his activities of daily living indicated that his pain was not as limiting as he testified, Mr. Reyes only pursued limited and conservative treatment inconsistent with the claimed severity of his pain, and his testimony was not supported by the weight of the objective medical evidence (R. 18, 29).

---

[7] Social Security Ruling 16-3p, effective March 28, 2016, see Social Security Ruling 16-3p, Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims, 2016 WL 1237954 (Mar. 24, 2016) (correcting effective date of original Ruling), rescinded SSR 96-7p. Social Security Ruling 16-3p, Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims, 2016 WL 1119029, at *1 (Mar. 16, 2016). The ruling "eliminat[es] the use of the term 'credibility' from ... sub-regulatory policy, as [the] regulations do not use this term" and is intended to "clarify that subjective symptom evaluation is not an examination of the individual's character." Id., n.1. As it is intended to be a clarification of existing law, SSR 16-3p likely applies retroactively, *see Pope v. Shalala*, 998 F.2d 473, 483-84 (7th Cir. 1993), *overruled on other grounds Johnson v. Apfel*, 189 F.3d 561 (7th Cir. 1999), but, as the ALJ here didn't get into character, the new ruling's focus does not change our analysis. The term "credibility" is used herein only as a convenient shorthand for "evaluation of symptoms" and in view of the fact that it is ubiquitous in Seventh Circuit case law applicable to our review of the ALJ's decision.

Reviewing courts should give deferential treatment to the ALJ's credibility determination, only overturning it if it is "patently wrong." *Jones v.* Astrue, 623 F.3d 1155, 1160, 1162 (7th Cir. 2010); *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008); *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006). In other words, the ALJ's credibility determination should only be overturned if it was unreasonable or unsupported. *Prochaska*, 454 F.3d at 738; *Sims v. Barnhart,* 442 F.3d 536, 538 (7th Cir. 2006). When reviewing the ALJ's credibility determination, the court needs to ensure that it was supported by the evidence and specific enough for a "reviewing body" to understand the ALJ's reasoning. *Craft*, 539 F.3d at 678; *Zurawski*, 245 F.3d at 887. In this case, the ALJ's decision was unreasonable, unsupported, and not specific enough for this court to trace the path of its reasoning.

### a.
### Activities of Daily Living

Mr. Reyes argues that the ALJ's analysis of his activities of daily living was flawed. The ALJ concluded that Mr. Reyes' allegation about his impairments lacked credibility in light of his daily activities because first, they could not be verified with a "reasonable degree of certainty" in light of what she considered to be "contradictory" statements made by Mr. Reyes, and second, it was difficult to attribute the limitation in Mr. Reyes' activities of daily living to his medical condition as opposed to other reasons (R. 29).

The ALJ was incorrect to reject Mr. Reyes' allegations about his activities of daily living because they could not be verified with a "reasonable degree of certainty." An ALJ must consider the claimant's subjective complaints of pain if a claimant has established that a medically determined impairment could have reasonably caused the pain. *Moore v. Colvin*, 734 F.3d 1118, 1125 (7th Cir. 2014). Because Mr. Reyes was able to establish that he suffered from a medically determinable impairment, a gunshot wound, the ALJ was incorrect to doubt Mr.

Reyes' credibility on that basis alone. *Id.* The fact that subjective reports and complaints from the claimant may be unverifiable is not alone enough of a reason to discount them. *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014). As the Seventh Circuit has succinctly put it while overturning an ALJ's credibility determination based on this exact line of reasoning, "[w]hatever uncertainty may exist around such self-reports is not by itself reason to discount them—otherwise, why ask in the first place?" *Beardsley*, 758 F.3d at 837.

The ALJ was also incorrect in stating that Mr. Reyes' statements about his limited activities of daily living were inconsistent and contradictory. She explained that, contrary to his written statements, at the second hearing Mr. Reyes testified that he "assisted his grandmother" when he lived with her alone, took her to appointments, and was independent in self care (R. 29). However, the ALJ misconstrued his testimony. Mr. Reyes stated that he currently helps his grandmother very little, and that his mother does almost everything for her (R. 1119). Prior to his mother's arrival, he would "try" to pick up around the house in order to assist his grandmother, but he mostly just kept an eye on her to make sure that she took her medicines (R. 1120). During this time, he did not help her with cooking or with the laundry (R. 1122). He testified that he did not clean up the kitchen or wash dishes because it pained his shoulder (R. 1122). He testified that "off and on" he would accompany his grandmother to the grocery store, but doing so made him feel like he was having a panic attack (R. 1119). Essentially, when the ALJ said that Mr. Reyes "assisted his grandmother" what she meant was that he watched over her and made sure that she took her medicine, which is not inconsistent with his pain allegations. *Cf. Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005)(plaintiff may have no choice but to care for family member); *Braddy v. Colvin*, No. 14 C 1265, 2015 WL 500646, at *8 (N.D. Ill. Feb. 4, 2015)("Moreover, [plaintiff] takes care of her mother because she has to.").

While it is true that Mr. Reyes testified in the second hearing on April 7, 2015, that he could dress, bathe, and feed himself, that testimony was not inconsistent with his prior written testimony (R. 1119). On the Function Reports that Mr. Reyes filled out on May 5, 2013 and November 4, 2013, he stated that it was *painful* to dress, bathe, and feed himself (R. 175, 193). Earlier in his hearing, Mr. Reyes made it clear that he was in constant pain and could only use his arm for about two minutes before it would cause him pain (R. 1108). Moreover, he filled out these forms roughly two years prior to giving the testimony. That his testimony about his abilities can even be said to have changed over time does not necessarily indicate an inconsistency. Rather, it would indicate that symptoms change and evolve over the course of two years' time. The ALJ should not have assumed that this meant that Mr. Reyes was improving, but rather that he had to do certain required daily activities himself because he could no longer constantly rely on other people to assist him.

Furthermore, the fact that Mr. Reyes occasionally went grocery shopping with his grandmother and took her to appointments does not equate to an ability to work a 40-hour week. A claimant's allegation of disabling pain cannot be disproved by "limited daily activities." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009) (holding that the ALJ incorrectly concluded that because the claimant did housework, shopped, drove short distances, walked her dogs, and played with her grandchildren that she could perform substantial gainful activities); *Craft*, 539 F. 3d at 680. The ability to perform household activities, which are often done out of necessity, cannot be compared to the ability to hold down a full time job because of flexibility and choice in when and how hard to work, ability to rest, access to help from other persons, and no minimum standard of performance. *Forsythe v. Colvin*, 813 F.3d 677, 679 (7th Cir. 2016); *Hughes v. Astrue*, 705 F.3d 276, 278-79 (7th Cir. 2013). Furthermore, household activities

generally do not consume a substantial part of the claimant's day, as is true in this case. *Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004). Consequently, in evaluating a claimant's activities of daily living, an ALJ ought to pay attention both how the claimant carried out and how he responded to such activities, which the ALJ in this case failed to do. *Craft*, 539 F.3d at 680.

Dressing, bathing, and feeding one's self are not optional chores. The ability to complete household activities that a claimant does not have much of an option to do is a poor measure of the claimant's RFC because sheer necessity compels people to perform tasks regardless of pain. *Forsythe*, 813 F.3d at 679; *Hughes*, 207 F.3d at 278-279 (criticizing the ALJ's reliance on the claimant's activities of daily living because she had to buy groceries or she would starve, and she had to do laundry because she could not afford to hire someone else to do it). Mr. Reyes had no option but to bathe and dress himself, and no option but to feed himself. While it is true that his mother or grandmother could theoretically have assisted him with these things, his grandmother was sick and his mother was busy aiding his grandmother. He needed to find a way to do these daily activities himself seeing as it appears as though his pain was not going away.

Finally, this court cannot accept the ALJ's unsupported argument that Mr. Reyes' limitations could be the result of "other reasons." (R. 29). The ALJ never stated what those other reasons could be or what lead her to think that there may be other causes of his symptoms. Mr. Reyes consistently stated that he could not often leave the house because he was afraid of being shot, and he could not do things like the dishes for long periods of time because of the left arm and shoulder pain. The ALJ simply asserted that this could be attributed to other reasons when the weight of the evidence suggests that is was related to the shooting.

**b.**
**Limited and Conservative Treatment**

Mr. Reyes next criticizes the ALJ's characterization of his treatment history as "limited and conservative." In articulating her reasons for disbelieving Mr. Reyes' allegations of pain, the ALJ noted that, other than the two surgeries to remove the bullet, his treatment was conservative and limited (R. 29). She highlighted Mr. Reyes' failure to undergo diagnostic testing, such as EMG, or pain management, noting that a majority of the medical record was medication refills (R. 29). The ALJ acknowledged that Mr. Reyes repeatedly explained that his lack of the treatment was due first to his lack of health insurance and then due to the limited health coverage with his particular provider, CountyCare (R. 29). However, she responded by stating that health insurance issues do not excuse him because emergency rooms were a viable option (R. 29).

In assessing frequency of medical care or treatment, an ALJ must inquire about and explore the claimant's explanations for the sparse care or treatment. *Craft,* 539 F.3d at 679. While the ALJ did discuss Mr. Reyes' problems with his insurance, she quickly dismissed them by claiming that he could have gone to the emergency room (R. 29). However, emergency rooms are not a viable option for a claimant to rely on as they are expensive, relentless about collecting fees from the claimant after their visit, and only required to treat indigent patients experiencing a medical emergency, which Mr. Reyes was not. *Goins v. Colvin*, 764 F.3d 677, 679-80 (7th Cir. 2014); *Hughes*, 705 F.3d at 278. Seeing as applicants for Supplemental Social Security Income must have limited income in order to qualify in the first place, Mr. Reyes would not have had the funds to pay for a visit to the emergency room every time that he complained of shoulder pain, which appears to have been weekly for two years. *Goin*s, 764 F.3d 677 at 680.

Further, if an ALJ criticizes a claimant for not seeking aggressive treatment, she needs to consider what treatment would have actually remedied the claimant's ailments. *Hughes*, 705

F.3d at 278. In this case, the ALJ made little mention of what kind of treatment would have solved Mr. Reyes' problems. She mentioned pain management, but Mr. Reyes had been on pain medication since his original accident, undergone two surgeries, and seen various doctors. Yet, he still complained of pain in his right arm. Likely, Mr. Reyes was hesitant to continue trying other options when nothing seemed to work.

Furthermore, the fact that Mr. Reyes chose to undergo serious treatment, such as taking strong pain medication and having surgeries, indicates that his complaints of pain were likely credible. *Scrogham v. Colvin*, 765 F.3d 685, 701 (7th Cir. 2014). Mr. Reyes elected to have two surgeries, despite the fact that his first surgery was unsuccessful, and he was warned that the second surgery could potentially worsen his pain (R. 555). Further, the fact that physicians were willing to prescribe him strong pain medication indicates that they likely believed his allegations of pain to be credible. *Carradine*, 360 F.3d at 755. It is unlikely that Mr. Reyes would have taken over eight different medications for his pain and had two surgeries merely to strengthen his credibility and increase his chances of obtaining benefits. *Id.*

In another part of her decision, which was not mentioned in the claimant's memorandum, the ALJ wrote that Mr. Reyes could have found other ways to obtain cheaper healthcare (R. 28-29). However, the ALJ provided no support for this assertion. *Id.* How was Mr. Reyes supposed to know where to locate these "cheaper" healthcare options? Nothing in the record indicates that anyone ever advised Mr. Reyes to seek out a low-income option or provided him with the name of any low-income provider. According to his testimony, he had a hard enough time finding any doctor on the list of referrals he was given at the hospital and by Dr. Patel (R. 48-49, 1104, 1098). Also, recall that Mr. Reyes has a strong work record. While many disability benefit claimants have a long history of relying on subsidized health care and government programs,

Mr. Reyes does not. As such, he's not going to be as conversant with the options available as many other claimants the ALJ may have dealt with. *Cf. Dziekan v. Colvin*, No. 12 C 3211, 2013 WL 3929998, at *10 (N.D. Ill. July 30, 2013)(individuals who have worked and supported themselves their whole lives are not intimately familiar with government programs).

The ALJ also found fault with Mr. Reyes for continuing to take Zoloft while at the same time complaining about the side effects (R.29). But, some patients may think that the benefits of a particular drug outweigh the side effects, *Terry v. Astrue*, 580 F.3d 471, 477-78 (7th Cir. 2009), and clearly this was the case for Mr. Reyes. Overall, Mr. Reyes appears to have done everything that he could reasonably be expected to do in pursuit of relief. He attended routine appointments with both Dr. Patel and Alyssa Naimon. He never once refused treatment, and nothing in the record suggests that he failed to take his medications. The ALJ did not provide any examples of a time when Mr. Reyes found a doctor willing to take his insurance and refused to attend appointments. Consequently, the ALJ's rejection of Mr. Reyes' testimony on the basis that his treatment was "limited" or "conservative" was erroneous.

**c.**
**Objective medical evidence**

Third, Mr. Reyes objects to the ALJ dismissing his allegations because they were not "fully corroborate[d]" by the medical evidence (R. 18). The ALJ noted that nothing in the medical evidence indicated a major injury (R. 18). While the ALJ is correct in stating that X-Rays and diagnostic testing did not indicate neurological damage or injury, that is not enough to discredit Mr. Reyes' allegations, which were consistently reported by Mr. Reyes and supported by multiple doctors over two years' time.

Medical science confirms that because pain is subjective a claimant's pain can be severe and disabling without a diagnosable cause or the support of "objective medical findings." *Adaire*

*v. Colvin*, 778 F.3d 685, 687 (7th Cir. 2015); *Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006); *Carradine,* 360 F.3d at 754. An ALJ may not rest her dismissal of a claimant's complaints too heavily on the absence of objective support. *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014). People have different pain thresholds and experience pain differently based on a variety of factors, which is something that cannot be shown in a medical test or lab report. *Johnson*, 449 F.3d at 806. This is even more likely to be the case in instances of chronic pain, like Mr. Reyes suffers from. *Id*. Consequently, the severity of a Mr. Reyes' pain cannot be dismissed solely because it is in excess of or unsupported by objective medical evidence. *Johnson*, 449 F.3d at 806; *Pierce*, 739 F.3d 1050. But, given the fact that the ALJ's two other rationales for rejecting Mr. Reyes' testimony were flawed, that's the end result here. Moreover, the ALJ quickly discounted the opinion of Dr. Patel, barely mentioned the medical records from Dr. Frisch, and almost entirely ignored the warnings from Dr. O'Leary that surgery could worsen Mr. Reyes' pain.

Of course, claimants have an incentive to overstate their pain, *Hall v. Colvin*, 778 F.3d 688, 691 (7th Cir. 2015), and discrepancies between a claimant's testimony and objective medical evidence may hint that the claimant is exaggerating his symptoms. *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008); *Turner*, 390 F. App'x at 585 (finding the claimant knew that his treating physician's testimony would factor into his disability evaluation so he had motive to exaggerate). But, given the trouble Mr. Reyes has gone through getting health insurance, waiting in lines, attempting to find doctors who would take his insurance, having two surgeries, and seeing multiple doctors, it seems a bit much for it all have been geared toward getting disability insurance. Furthermore, given the treatment he did manage to receive, he would had

to have been quite an actor to convince multiple doctors and emergency room personnel that he was in extreme pain. *Carradine,* 360 F.3d at 755.

The objective medical evidence did not directly support Mr. Reyes' symptoms, but it did not disprove them either. It is not as if Mr. Reyes claimed to have a particular disease, but objective medical evidence ruled out the possibility, which is the situation in many precedential cases. *Zblewski*, 302 F. App'x at 494. Mr. Reyes claimed pain in his right shoulder from being shot and having two consecutive surgeries. Nothing in the record suggests that Mr. Reyes was not actually experiencing the pain that he claimed. Because Mr. Reyes produced medical evidence of an underlying impairment, the ALJ was incorrect in discrediting his testimony about his subjective symptoms simply because they were unsupported by X-rays and medical tests.

## 2.
## Weight of medical opinions

Mr. Reyes' secondary contention is that the ALJ improperly rejected the opinions of his treating physician, Dr. Patel, and his examining physician, Dr. Ahmadi, instead giving weight to the state agency physician, Dr. Jilhewar.  The ALJ's indictment of Dr. Patel's medical opinion is undermined by the fact that the ALJ's credibility assessment of Mr. Reyes was faulty and unsupported by substantial evidence. The ALJ dismissed Dr. Patel's opinion largely because she found it based solely on Mr. Reyes' self-reported symptoms. However, that assumes that Mr. Reyes was not credible and thus not truthful in reporting his symptoms to Dr. Patel, which we have no reason to believe.

The ALJ dismissed Dr. Patel's opinion and gave it "little if any weight" for a few different reasons (R. 26). First, she found that Dr. Jilhewar persuasively explained that Dr. Patel's conclusions were not supported by the treatment record (R. 26). Second, she noted that Mr. Reyes sat for over an hour during the hearing, therefore Dr. Patel's finding that Mr. Reyes

could only sit for about two hours in an eight-hour day was flawed (R. 26). Third, she indicted Dr. Patel's claim that Mr. Reyes could only stand/walk for less than two hours per day by pointing out that his gait was normal and he demonstrated no deficits in his weight-bearing areas (R.26). Finally, she stated that Dr. Patel's findings were inconsistent because he noted that Mr. Reyes' right shoulder tests were normal but still concluded that he had a limiting weakness in his right arm (R. 26).

A treating physician's opinion is entitled to controlling weight as long as it is well supported by medical findings and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); *Denton v. Astrue*, 596 F.3d 419, 424 (7th Cir. 2010); *Clifford*, 227 F.3d at 87. To the extent that the treating physician's opinion is consistent with the relevant treatment notes and the claimant's testimony, it should form the basis of the ALJ's determination. *Bates v. Colvin*, 736 F.3d 1093, 1099-100 (7th Cir. 2013). Dr. Patel's opinion was supported by over two years of monthly appointments with Mr. Reyes, Mr. Reyes' consistent testimony, as well as the opinions of Drs. Frisch and O'Leary (R. 410-48, 512, 555, 848-51, 854-55).

Because the ALJ declined to give Dr. Patel's opinion controlling weight, she was required to provide a "sound explanation" and "good reasons" for not doing so. *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011); *Campbell v. Astrue*, 627 F. 3d 299, 306 (7th Cir. 2010); *Zblewski v. Astrue*, 302 F. App'x 488, 493 (7th Cir. 2008). The ALJ must consider various factors including the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion. 20 C.F.R. § 404.1527(d)(2); *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011). The ALJ failed to consider these aspects of Dr. Patel's treatment of Mr.

Reyes. Dr. Patel saw Mr. Reyes monthly for over two years (R. 848), which increases the importance and credibility of his opinion given that he was able to observe Mr. Reyes over an extended period of time. *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008). He was his primary care physician, prescribing medicine, conducting tests, and reviewing medical records (R. 410-48). Moreover, Dr. Patel's observations are consistent with those of Dr. O'Leary, Dr. Ahmadi, and Dr. Frisch as well as Mr. Reyes' testimony and all of the documents that Mr. Reyes submitted to the Social Security Administration.

The only part of the 1157-page medical record that calls Dr. Patel's opinion into question is the expert testimony of Dr. Jilhewar, who never met with Mr. Reyes prior to giving his testimony. When treating and consulting physicians present conflicting evidence, the ALJ can decide which physician to believe as long as substantial evidence supports her decision. *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). The ALJ presented little evidence in support of Dr. Jilhewar's conclusion nor a real reason to prefer Dr. Jilhewar except for the fact that he was able to review the entirety of the medical records (R. 26). This explanation is insufficient given that Dr. Patel had access to Mr. Reyes' medical records and spent about two years more time with Mr. Reyes than did Dr. Jilhewar. No other medical opinion presented in this case provided a "similarly comprehensive picture" of Mr. Reyes' mental and physical health. *Jelinek*, 662 F. 3d at 812.

Dr. Jilhewar doubted the Mr. Reyes' allegations due to what he identified as a lack of objective medical evidence of pain (R. 1142). While he admitted that pain was subjective, he expected Mr. Reyes to have intensity of pain management for his allegations to be credible (R. 1142). Finding none, he dismissed Mr. Reyes' allegations of pain as unreliable (R. 1142). It was incorrect both for Dr. Jilhewar to draw this conclusion and for the ALJ to rely on it because, as

already discussed, even without objective evidence, pain can be disabling. *Stark v. Colvin*, 813 F.3d 684, 687-88 (7th Cir. 2016). Testimony of severe pain cannot be disregarded just because it is not supported by objective medical evidence. *Id*; *Hall v. Colvin*, 778 F.3d 688, 691 (7th Cir. 2015); *Pierce*, 739 F.3d at 1050. Therefore, both Dr. Jilhewar and the ALJ were incorrect to demand objective medical evidence of pain. *Cf. Mack v. Colvin*, No. 14 C 3945, 2015 WL 8481960, at *4 (N.D. Ill. Dec. 10, 2015)(medical expert improperly demanded onset of impairment be established by objective medical evidence).

Regarding the ALJ's assertion that Mr. Reyes sat for over an hour during the hearing, an ALJ is permitted to consider her own observations of the claimant's behavior during administrative proceedings as part of her evaluation of the claimant's credibility. *Williams-Overstreet v. Astrue*, 364 F. App'x 271, 275-76 (7th Cir. 2010). However, in this case, the ALJ's observation did not contradict Dr. Patel's findings. Dr. Patel concluded that Mr. Reyes could not sit for more than two hours (R. 850). During the hearing, he did not sit for more than two hours; he sat for more than one hour (R. 26). Nothing about Dr. Patel's findings are disproven by the ALJ's observation.

Finally, the ALJ also dismissed Dr. Ahmadi's report in favor of Dr. Jilhewar's opinion. First, she stated that Dr. Ahmadi described objective findings that "contrast[ed] markedly to all other records" such as motor agitation with sad irritable mood, constricted affect, increased intensity, slow speech, hopelessness, anhedonia, circumstantial thought process and a cognitive deficit on attention (R. 24). Second, she argued that his opinion was only based on a "single encounter" during which Mr. Reyes complained of symptoms that he had not mentioned before like abnormal motor movements and hallucinations (R. 25). While Dr. Ahmadi only met with Dr. Reyes once, his clinical intern met with Reyes a number of times, and thus Dr. Ahmadi had

all of the reports from when he met with the clinical intern (R. 1039). Dr. Jilhewar had never met with Mr. Reyes at all.

## Conclusion

The plaintiff's motion for remand is GRANTED, and the Commissioner's motion for summary judgment is DENIED.

ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

**DATE:** 10/25/16